Please call the case. Please step up for those who are going to testify, identify, or who are going to argue. Good morning, Justices. My name is Carlton Fisher on behalf of the appellants. Good morning, Your Honors. My name is Lynn Dowd on behalf of the plaintiffs and police. And you both know this speaker that is not a speaker that's for taping, so just please speak up. It's a standard amount of time, but if you go over, since there's only the one case, we won't, unless you decide to go on and on and on and on. All right. Proceed. May it please the Court. This is a case about a wrong-way driver whose fault still needs to be accounted for, and a trial court that ignored and rejected this appellate court's mandate from five years ago in what I will call Denton 1. This is not a case about an archdiocese shuffling pedophile priests from church to church. The mandate is the first issue I wish to speak to. In answer to the certified interlocutory questions that were framed and worded by the plaintiffs' counsel, the response of this court was very precise. Quote, contrary to the circuit court, we conclude that Indiana law governs the liability and damage issues in this case. The trial judge ignored this mandate on three occasions on the record, first at 919. Quote, it's my position that Illinois damage law applies, unquote. At 3292, I ruled that Illinois law applies to damages. And at 1453. Why doesn't it? I'm sorry? Why doesn't it? That's the forum. It doesn't because this court in Denton 1 decided that Illinois, excuse me, Indiana law applies to both liability and damages. Well, they did what they could. But they still have to follow the forum law of the state that the case is in. But not, Your Honor, if this particular court has already decided that Indiana law applies. In order for it to be different, the plaintiffs would have had to have done one of two things. Number one, sought reconsideration from this court. They did not. Or seek a petition for legal appeal to the Illinois Supreme Court. I thought you guys wanted Illinois law to apply to certain damages issues in this case, too. Am I wrong? No. No. Collateral source? A good example. Under Stanley and Padgett in Indiana, it's clear that the proof one can offer up for the reasonableness of medical expenses in Indiana is cross-examination of treating physicians or the direct examination of my medical billing expert, Christine Krepp, which I was not permitted to give. That's a good example of the law that could have made a difference. Hundreds of thousands of dollars were on the line. So you wanted Medicare law to apply? No. Not at all, Justice. Medicare happened to have been in our expert's report a lodestone one could look at. We didn't rely upon it. Instead, she relied upon the normal commercially accepted numbers, but more importantly, the numbers that were actually accepted by the workers' comp carrier in this particular case. All right. Well, let's go back to what you called Denton number one, because when you were here before, and I was on the panel, I wrote it, I typed it. You argued from the very beginning in this case that it was beyond peradventure that Mr. Callis was the precipitating cause, the main cause of this accident, right? I did. And you quoted in there most of the information came from the police report, right? Indeed. I think probably part of that, because you guys are fond of it, was put in bold. So you're good at overstatement, but also understatement, because your first footnote in the brief in front of us now indicates that much of the facts that we relied upon in Denton one came from that police report. I think I noted that in the footnote to make sure the court did not believe we were trying to suggest that this Was there anything that this court or the trial court did that prevented the defendants from putting in their entire case against this wrong-way driver? Yes. What? Among the things is two of the three police officers had opinion testimony that their foundation was appropriate and that could have offered up the opinions they gave in their discovery depositions of these were the causes. That was not permitted by the trial court. So that's one example. The other examples, we got to put on our case, and unfortunately the jury decided 0%, although there was an Indiana jury instruction that clearly said that he had to be found at fault unless the behavior was excused. There was no evidence of excuse in this particular case. Well, you can find that a defendant is at fault, but that their conduct doesn't contribute to causing the injury. That is a possibility, Justice. But in this particular case. I suppose you think it's beyond perventure, though, right? I do not. I mean, you know, let's be frank here. You have a case in which a wrong-way driver is on the road and then there's an accident and one would think that there's going to be some involvement and that he's going to have some percentage. And you were here in front of us because you wanted to make sure that his name would be on the verdict form. It was on the verdict form. You were here because you wanted to make sure that they could ascribe a percentage of fault. It was there, and they put 0. So instead of the fact-act to me, it seems like we have a proof-act to me because the jury didn't believe the case that you had against this driver. Excuse me, against the wrong-way driver. And for whatever reason, that is a decision they made. Now, as I argued in the – as we argued in the appellant briefing, that particular issue was perhaps ignored by the jury because of the inflammatory nature of the closing arguments. I mean, I can't speculate. I'm not trying to be an amateur psychologist as to why it is the jury did what it did. But the law was very, very clear and told them if you find him at fault, if you find this and it's unexcused, there has to be an out-of-fault finding. The case we cited from Indiana jurisprudence, Barnard v. Hines, that's a case where somebody crossed the center line and was only assessed 1 percent. Indiana Court of Appeals reversed. It's the same analysis as this particular case. Clearly the same analysis. And that Indiana law, I would suggest, while not controlling, it is certainly persuasive. Well, the thing I think you're ignoring here is the weight of the testimony as to the qualifications and the conduct of the defendant driver in this case. I mean, come on. This guy was an accident waiting to happen based on the testimony at trial. If one were to presume that any action, any prior bad act by David Lee Johnson means that there is going to be an event that's going to result in punitive damages if he's hired or retained, yes. But the law, Indiana law applicable to this case, is much more expansive and much more friendly, I suppose, to a defendant corporation who qualified this driver and who hired him in an attempt to try to suggest, in an attempt to defend against these actions. There's no substantial similarity between what he was doing beforehand. The jury was instructed that all the instructions that you wanted to get on Indiana law as it relates to punitive damages were given, right? They were. They were. The trial judge cobbled together, not in the exact precise form that the Indiana instructions say, cobbled some of them together. But when one looks at the entirety of the facts and the law in this particular case, there should have at least been some percentage assessed. We're not – I'm not saying – He never saw this person. There's a dispute in the facts on that particular case. He didn't slow down when everybody else did. He slowed down, but as to quote – When he's about ten foot away. I think it was more than that, Justice, because we had some technology that showed what the slowing was. I think to sum up really what the criticism of Mr. Johnson was, was Gyorgy, the plaintiff's expert. I asked him, so basically your criticism is he didn't slow down as well as the others. Yes, that's the basic thing. And so it is – Well, that's a classic fail to reduce speed. I mean, you know. Agreed. But that doesn't mean that the person who precipitated this entire chain of events escapes responsibility and liability. Counsel, isn't that a question of fact for the jury to determine? Except in this particular case, given the Indiana law that's applied, that particular jury instruction where fault must be assessed according to that jury instruction, I submit that there had to have been some percentage upon – But fault was ascribed. His name is on the verdict form as being at fault, but there's no percentage because they didn't believe that his conduct was a cause. It could be a condition rather than a cause. You're familiar with that line of cases, are you not? In Illinois. Yeah. In Indiana, I don't think they recognize that particular nomenclature. But the point being made here is that the Barnard case, I think, is the authority I present to you for consideration in saying that there should have been a reassessment of his fault. On a retrial, if the court is going to be good enough to grant a retrial in this case, then there is another Indiana jury instruction, I would submit, that could be used that would talk about excuse from the law. I can't explain why the jury did that. So may I move on to another argument? Thank you very much. So just basically summing up, the mandate is the mandate, and Illinois, excuse me, Indiana law and Indiana damages, the liability law and damages law should have been assessed. Saddam. The Saddam case from the Indiana Supreme Court. Zeroing right in on the decision itself, I want to point out to the Court two very important footnotes for your consideration. Footnote four is the footnote of the Saddam decision, where the Court recites all of the legion of cases over the previous 50 years that shows that the only time under Indiana law that a negligent hiring and retention claim can be made is when the driver or the employee or the agent is acting outside the scope of his employment. That was not the case here. So it was. She's Wolf or what? That was not the law. That's right in there. That's not. I would submit if one now looks at. Go back and read it again. Footnote number three. Footnote number three. The Court notes, quoting the Lyon case, that there are special circumstances. One of them is an employee commits an intentional tort, not alleged here. Number two, an employee is incapable of being negligent. That's a reference to the 1907 Broad Street case where a child of the defendant, a seven-year-old can't be guilty. A buggy case or something? Indeed, yes. And then. We're not going to go buggy here. We're not going to. Thank you. And when an employer is a charitable institution, certainly, according to the final argument of the plaintiff, UACL was not a charitable institution. So the last sentence of that note is perhaps what the Justice is referring to. The Court noted that negligent hiring claims are advantageous in cases involving punitive damages. It cites the Tyndall case. The Tyndall case did not say that that's an exception to that rule. This is unlike the case I'm quite familiar with, Gantt v. LU Transport in Illinois, where there's an exception and it's enunciated in another First District case. That's not Indiana law. As Saddam made it very, very clear, you can only have a negligent hiring and retention claim if there is an employee or agent who's acting outside the scope. That is Indiana law. And so for there to have been a verdict in this case on either compensatory damages or punitive damages that ascribed a negligent hiring and retention claim against my client, UACL should be vacated. Indiana law does not support that one iota. The next case that I want to talk about or the next argument is the punitive damage claim. Now, the Justice says you've raised this issue about some might argue, Justice Lavin, that David Lee Johnson was a poster child for negligent hiring. I get it. I think he's sort of looked at that way. Well, the person who reviewed his application dinged him and said no. But indeed, I want to talk about that. The first person said no, not appropriate. The second person, Doug Mote, the guy who's going to make the decisions, he looks through. He's having a hard time as all trucking companies are trying to find good drivers. He looks at it and says, you know what? I talked to him. I'm satisfied. I'm going to give him a chance. Well, actually, Doug Mote did more than that. He gave him a second chance. Second chance on the retention issue is later in his one-year time period where he doesn't do certain things. He's supposed to come in and do certain things. But you only have two cases in Indiana jurisprudence that one needs to go to, the Westray and the Wonky case. Let me remind the Court that in Westray, that particular employee had four motor vehicle accidents, multiple speeding tickets, fines for falsifying log books, multiple license suspensions, and equipment violations on the day of the accident. In Westray, the $35 million punitive damage award was reduced by 90 percent down to 3.5 by the trial judge in Indiana, and then by the appellate court vacated entirely. Those facts were not good enough. What about Wonky? Facts are even worse. False road test certifications. Gave the driver the answer to the written test. Failed to check out a state driving record. Hired the driver despite the CDL having been suspended for failing to appear in court. Sound familiar? Arrested three times while driving while license suspended. Sound familiar? Hired a driver in violation of internal hiring policies. Once again, sound familiar? Failed to terminate the driver in violation of the company requirements. Again, spot on with our case. How about when Mr. Moe testified that Johnson should never have been allowed to drive a UACL rig? Does that sound familiar? Sounds familiar, and certainly isn't that a statement made with the incredible prism of hindsight? Certainly we can all say afterwards and say that. I guess in hindsight he also acknowledged that he was a marginal candidate. Those are his words. Yes, agreed. And said that he was forced to accept marginal drivers in order to make a profit. Yes, he said that. I agree. Those facts are no different than Wonky or Westray. No different. So with regard to punitive damages, it shouldn't have been assessed, there shouldn't have been a negligent hiring and retention claim. And if I might speak just very briefly about the excessiveness of the punitive damages, the briefs talk about that. I think our brief carries the day in terms of the authority and when one makes a comparison to similar punitive damage claims that are articulated in the Indiana case. Now, I'd like to, with my final four to five minutes of my initial 20-minute period, I want to talk about the closing argument because maybe we'll find out in that.